GINARTE O'DWYER GONZALEZ
GALLARDO & WINOGRAD LLP
400 Market Street
Newark, N.J. 07105
Counsel for the Plaintiff, Ronald Bonilla
(973) 854-8400

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD BONILLA | ) | Case No.: |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **COMPLAINT AND** |
| | ) | **DEMAND FOR JURY TRIAL** |
| BOROUGH OF BUENA, and | ) | |
| DAVID P. SHERMA, | ) | |
| | ) | |
| Defendants. | ) | |

The Plaintiff RONALD BONILLA, by and through his attorneys GINARTE, O'DWYER
GONZALEZ, GALLARDO & WINOGRAD LLP, alleges as follows:

## PARTIES AND ACTION

1.     This is a civil action brought by a current police officer of the Borough of Buena,
Plaintiff Ronald Bonilla ("Officer Bonilla"), to redress the deprivation of rights provided to him
under 42 U.S.C. § 1981, 42 U.S.C. § 1983; the New Jersey Law Against Discrimination codified
under N.J.S.A. 10:5-1 et seq., and the New Jersey Conscientious Employee Protection Act,
codified at N.J.S.A. 34::19-1 et seq.     Defendants unlawfully discriminated against Officer
Bonilla on account of his race, and unlawfully retaliated against Officer Bonilla after he
complained that that the Buena Police Department was engaged in racial profiling targeting
Hispanic drivers and complained that he himself was the victim of discrimination.

2.     Officer Bonilla is a Hispanic (Puerto Rican) resident of the City of Vineland, County of

1

Cumberland, and State of New Jersey. Officer Bonilla has been employed as a Patrolman by the Borough of Buena Police Department (the "BPD") since August of 2009.

3.　　Defendant Borough of Buena (hereinafter "Buena") is a borough located in Atlantic County, New Jersey, organized by virtue of New Jersey law and pursuant to that law, is to be known and distinguished by the name "BUENA." The Buena Police Department ("BPD") is an agency of and arm of Buena responsible for policing the borough.

4.　　Defendant David P. Sherma (hereinafter "Chief Sherma") is a Caucasian male, and Chief of the BPD. Chief Sherma is the highest ranking officer in the BPD and is employed by Buena. As Chief, Chief Sherma was and is Officer Bonilla's commanding officer, having influence and control over the terms and conditions of Officer Bonilla's employment at the BPD, and having influence and control over the work environment at the BPD.

## JURISDICTION

5.　　Jurisdiction is appropriate pursuant to 28 U.S.C. §§ 1331 and 1367. Specifically, this matter involves a federal question. Venue is proper as all parties reside in New Jersey.

## FACTS

6.　　The BPD is organized as a paramilitary organization with a clear chain of command. Police officers are taught that breaking the chain of command is prohibited.

7.　　At relevant times, Chief Sherma commanded the BPD. At relevant times, Chief Sherma was responsible for enforcing the rules and regulations of the BPD, disciplining officers who engaged in misconduct or who violated an individual's civil rights, had the power to issue orders establishing policy within the BPD, and was directly responsible for controlling the work environment at the BPD.

8.　　The policies of the BPD are set by Chief Sherma and other government officials of

2

Buena. Because Buena failed to exercise its statutory responsibility of overseeing the BPD or Chief Sherma, at relevant times, Chief Sherma was enabled and encouraged to be the sole policy maker in the BPD. By the authority granted in him by Buena, Chief Sherma set the policy in the BPD and supervised the day-to-day operation of the BPD.

9.      Officer Bonilla became employed with the BPD as a Patrolman, in August of 2009. Officer Bonilla is the only current Hispanic police officer that is works for the BPD. All other officers of the BPD are Caucasian. Upon information and belief, the BPD has never employed any other Hispanic police officer.

10.    During his employment at the BPD, Officer Bonilla noticed that officers in the BPD were targeting Hispanic drivers.

11.    In the summer of 2010, Acting Sergeant Stacey Steudle ("Sergeant Steudle") (who at the time was a patrol officer), was discussing the amount of tickets that officers in the BPD issued. Sergeant Steudle told Officer Bonilla that "she is not a big ticket writer, but if I need to keep my stats up I will find a Mexican and write him ten tickets." Subsequently, Sergeant Steudle became Officer Bonilla's direct superior officer.

12.    Hispanic drivers were targeted by the BPD because of a managerial and discriminatory bias against minorities that was prominent in the BPD.

13.    Statistical evidence will show that at relevant times, a disparate amount of tickets issued by the BPD were issued to Hispanic drivers. Upon information and belief, Hispanic drivers were issued more tickets during a single stop, than were non-Hispanic drivers.

14.    In the summer of 2010, Officer Bonilla – the only Hispanic officer serving on the BPD – noticed that Hispanics living and working in the community feared the BPD and did not trust its officers. Several community members and organizations approached Officer Bonilla and

3

relayed this information to him.

15. A discriminatory managerial attitude existed in the BPD. Officers used racially derogatory terms to describe African Americans and Hispanics. Upon information and belief, at one point during his employment at the BPD before he was promoted to Chief of the BPD, Chief Sherma was reprimanded for making a joke out of a racially insensitive police report by prominently displaying it in the department.

16. In or around June of 2010, Officer Bonilla communicated with Chief Sherma. During this communication, Officer Bonilla complained to Chief Sherma that the BPD was engaged in racial profiling that targeted Hispanics. Officer Bonilla stated that the BPD was improperly treating Hispanics and that Hispanics in the community were scared of the BPD officers. Officer Bonilla suggested that the BPD address the situation and also form a "Hispanic mobile outreach" program to build a bridge between the BPD and the Hispanics working and living in Buena. Business owners and community organizations supported Bonilla and informed Chief Sherma of the necessity of such an outreach program and of the tension between Hispanics and the BPD.

17. Chief Sherma rejected the idea of a community outreach program and refused to address Plaintiff's complaints and concerns that the BPD was engaged in racial profiling that targeted Hispanics.

18. Shortly after this meeting, Officer Bonilla became the target of racially motivated mistreatment and harassment within the BPD. On several occasions, he was not backed-up by fellow officers in situations where back-up was both available and appropriate. Officer Bonilla was also told that superior officers were "watching him" and that he had better "dot his I's and cross his T's." Officer Bonilla noticed that he was becoming ostracized in the BPD by most of his fellow officers and all of his superior officers.

4

19.    Officers in the BPD had lockers for their personal belongings.  Some officers had various stickers on their lockers, relating to their national origin.  For example, one Officer had a sticker of an Irish flag.  Plaintiff's locker had a sticker of a Puerto Rican flag.

20.    In the fall of 2010, Sergeant Steudle became angered by the Puerto Rican flag on Officer Bonilla's locker and stated to Chief Sherma: "Who the hell does he [Bonilla] think he is to hang 'that flag' [the Puerto Rican flag] on his locker?"

21.    In October of 2010, an officer in the BPD told Officer Bonilla that he "pulled over a Spanish guy that had your last name – Bonilla – and I wrote him several tickets."    Officer Bonilla inquired as to why the officer did not call him as a courtesy, which Officer Bonilla said was customary in his experience.  Another officer then commented "this is Buena."    However, Officer Bonilla is aware of circumstances where Caucasian officers in the BPD telephoned fellow officers as a courtesy, after learning that they had pulled over a member of the officer's family.

22.    In the winter of 2010, Plaintiff noticed that the Puerto Rican flag on his locker was being covered-up and concealed.  At first, Bonilla thought nothing of the event, until it continued on a daily basis, and it became apparent that this was not accident or isolated incident.  Plaintiff's Puerto Rican flag was intentionally being concealed.

23.    In December of 2010 Officer Bonilla's Puerto Rican flag was being concealed on a frequent basis.  Toward the end of December, 2010, Plaintiff approached an officer who was in the BPD headquarters all day and who would have observed who was covering up the Puerto Rican Flag.    This officer reluctantly informed Officer Bonilla that Sergeant Steudle was concealing the Puerto Rican Flag on Plaintiff's locker.

24.    Sergeant Steudle began pretextually criticizing Officer Bonilla and belittling him.  On

one occasion, during a meeting at the BPD, Officer Bonilla inquired if Sergeant Steudle had been concealing the Puerto Rican flag on his locker, and if so, why. Sergeant Steudle became irate, screamed that Officer Bonilla had no right to talk to her, and kicked him out of the office.

25. Officer Bonilla then complained to Chief Sherma about Sergeant Steudle's conduct and on December 30, 2010, Plaintiff was advised that Chief Sherma was conducting an Internal Affairs ("IA") investigation. A "sham" IA investigation was commenced. Chief Sherma, who had a close personal relationship with Sergeant Steudle, was in charge of this internal investigation. No remedial action was taken to address Sergeant Steudle's conduct because Chief Sherma bestowed favors upon Sergeant Steudle on account of their personal relationship. Chief Sherma afforded preferential treatment to Sergeant Steudle and upon information and belief, allowed her to violate the rules and regulations of the BPD with impunity.

26. Instead of any remedial action being taken to address Officer Bonilla's complaints, Officer Bonilla was subjected to a wave of retaliatory conduct. Among other things:

> a. Within a day after Officer Bonilla complained to Chief Sherma, his complaint was disclosed to others, and a plastic sign was posted on his locker suggesting he should get out of the BPD. Officer Bonilla brought this sign to Chief Sherma's attention, and expressed concerns about retaliation. Nothing was done by Chief Sherma to prevent retaliation.

> b. On January 1, 2011, Officer Bonilla was falsely accused of not backing-up another officer. Plaintiff – the only Spanish speaker in the BPD – was assisting a Spanish-only-speaking citizen in relation to a domestic violence dispute that had just occurred.

> c. On January 2, 2011, Sergeant Steudle pretextually accused Officer Bonilla of

6

refusing to back-up a fellow officer and stated that she was going to initiate IA charges against him. Despite the fact that Plaintiff had not been backed-up on several occasions under circumstances where he should have been backed-up and no charges were ever brought against the Caucasian officers under those circumstances, IA charges were placed against Officer Bonilla by Steudle.

d. On one occasions, and on-duty officer was at the residence of Chief Sherma when Officer Bonilla confronted a suspect with a baseball bat and had requested back-up. Chief Sherma ordered this officer not to back-up Officer Bonilla.

e. Sergeant Steudle began telling other officers in the BPD that Officer Bonilla could not be trusted. This further ostracized Officer Bonilla in the BPD.

f. Sergeant Steudle, who had never before taken issue with Officer Bonilla's police reports, began pretextually criticizing Officer Bonilla's police reports, and demanding that he re-write them. Sergeant Steudle incessantly micromanaged Officer Bonilla as a means of retaliation and further harassment;

27. On or around January 12, 2011 Officer Bonilla was injured while on the job, requiring a leave of absence for him to recover from his injuries. Officer Bonilla injured his knee and hand and required surgery and therapy before he was able to return to full-duty status. Officer Bonilla, however, was fit for and available to perform light duty – which the BPD had plenty of.

28. On or around January 20, 2011, Officer Bonilla was given light duty at the BPD headquarters. Officers there refused to make any contact with him, further ostracizing Officer Bonilla in the BPD.

29. Regardless of his light duty status, the micromanagement of Officer Bonilla continued. On or around January 28, 2011, after Officer Bonilla had traveled home at the end of his light

7

duty shift, he was ordered to travel back to BPD headquarters and "log" all of his activities on a sheet of paper. Although Plaintiff had never before been asked to create any type of time log, Chief Sherma ordered Plaintiff to submit a detailed time log. Officer Bonilla complied with this order, and noted that he had never before been ordered to submit such a statement.

30. On February 2, 2011, Acting Sergeant Sammy Martinelli informed Officer Bonilla that Chief Sherma had stated "there is no more light duty for Officer Bonilla" and that he was to be removed from light duty assignments. There was no reason for this order other than to retaliate against Officer Bonilla and further harass him. There was plenty of light duty work available for Officer Bonilla. Officer Bonilla was forced to use his personal, vacation and accrued sick time on account of not being able to perform light duty work.

31. After February 2, 2011, Officer Bonilla and his physicians routinely advised Chief Sherma that Officer Bonilla was available for light duty work. As a form of retaliation and harassment, light duty assignments, which were requested by Plaintiff and recommended by his doctors, were withheld from Officer Bonilla.

32. On or around June 13, 2011, Officer Bonilla was given a light duty assignment in Buena's tax office, performing data entry and other tasks. Officer Bonilla was provided with a desk in the corner facing a wall. The second or third day after Officer Bonilla started this assignment, he noticed that a printed photo had been hung on the wall, such that Officer Bonilla would be directly facing it when he sat at his desk. The picture was a print out of a dog with a broom in one paw and a dust pan in the other. The dog was scooping up a pile of dog waste. Someone hand-wrote on the picture "Our new employee." Officer Bonilla asked workers if they saw who had put the sign there. The sign was hung deliberately at Officer Bonilla's desk, as a form of retaliation and harassment, and to humiliate Officer Bonilla.

8

33. On June 23, 2011, Officer Bonilla was given a letter by Chief Sherma that falsely accused Officer Bonilla of "incessant questioning of fellow employees about matters unrelated to work." This was not true. Officer Bonilla had only asked one employee questions about who put the photograph in front of his desk. As further retaliation and harassment, Chief Sherma advised Officer Bonilla that his last day of light duty assignment was June 24, 2011.

34. Additionally, as a means to "force out" Officer Bonilla from his civil service job at the BPD, Chief Sherma ordered that Officer Bonilla to undergo a psychological "fitness for duty" evaluation. In the law enforcement community, a fitness for duty evaluation is an embarrassing blemish on an officer's record and can be abused as a means to end the career of a police officer in a Civil Service municipality, such as Buena. Chief Sherma had no legitimate reason for ordering this psychological fitness for duty examination other than to retaliate against and humiliate Officer Bonilla. Officer Bonilla is and always has been psychologically fit for duty at the BPD.

35. On account of the racially hostile environment he has been forced to endure and the retaliatory actions and harassment he faced, Officer Bonilla has suffered from significant stress and anxiety, and he has suffered economic damages, equaling his lost accrued vacation time, sick time, and lost income.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. §§ 1981 and 1983 RACIAL HARRASMENT
### HOSTILE WORK ENVIRONMENT- BUENA

36. Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

37. Buena deprived and interfered with Officer Bonilla's rights, privileges and immunities to "make and enforce contracts" and "denied Officer Bonilla the same privileges, immunities and

9

rights as white person" secured under 42 U.S.C. §1981.

38.   42 U.S.C. § 1981 applies to Buena, *inter alia.*, on account of 42 U.S.C. § 1983.

39.   Acting under the color of law, Buena intentionally, knowingly, or with deliberate indifference to the rights of Officer Bonilla, violated his rights secured by 42 U.S.C. §§ 1981 and 1983.

40.   Buena is liable to Officer Bonilla as Chief Sherma used the authority vested to him by the policies of Buena – the rank of Chief – to create and/or be willfully indifferent to a discriminatory hostile working environment that impacted the terms and conditions of Officer Bonilla's employment.

41.   Buena is liable to Officer Bonilla as pursuant to the authority vested to him by the policies and customs of Buena, Chief Sherma's contribution and deliberate indifference to unlawful conduct, caused the racially hostile working environment.

42.   Buena failed to have in place effective policies and procedures for Officer Bonilla to utilize to complain about the harassment and retaliation he was facing in his work environment. The complaints raised by Officer Bonilla were not adequately addressed but actually resulted in the escalated harassment of Officer Bonilla.

43.   As a result of this discrimination, Officer Bonilla has suffered and will continue to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Chief Sherma for the following relief:

    a.   Compensatory Damages;

    b.   Punitive Damages;

    c.   Attorneys' fees and costs of suit;

d.  Such other and further relief that the Court deems equitable and just.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. §§ 1981 and 1983 RACIAL HARASSMENT
### HOSTILE WORK ENVIORNMENT
### INDIVIDUAL DEFENDANT

44.  Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

45.  Chief Sherma deprived and interfered with Officer Bonilla's rights, privileges and immunities to "make and enforce contracts" and "denied the same privileges, immunities and rights as white person" secured under 42 U.S.C. §1981, and applicable to Chief Sherma in his individual and official capacities pursuant to 42 U.S.C. § 1983.

46.  At relevant times, Chief Sherma was a policy maker for the BPD and was the commanding officer in charge of the day to day operations of the BPD.  In this role, Chief Sherma took actions that caused, or was deliberately indifferent to conduct that resulted in a discriminatory and retaliatory work environment.

47.  Acting under the color of state law, Chief Sherma deprived Officer Bonilla of his rights, secured by 42 U.S.C. § 1981, by creating or being willfully indifferent to a racially hostile working environment that impacted the terms and conditions of Officer Bonilla's employment.

48.  As a result of this discrimination, Officer Bonilla has suffered and will continue to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Buena for the following relief:

a.  Compensatory Damages;

b.  Punitive Damages;

c.  Attorneys' fee and costs of suit;

11

d. Such other and further relief that the Court deems equitable and just.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. §§ 1981 and 1983 – RETALIATION – INDIVIDUAL DEFENDANT

49. Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

50. Chief Sherma retaliated against Officer Bonilla and/or caused and condoned a pattern of retaliatory harassment against Officer Bonilla because Officer Bonilla attempted to enforce his rights under 42 U.S.C. §1981.

51. Chief Sherma, acting under color of state law, retaliated against Officer Bonilla and/or caused and condoned a pattern of retaliatory harassment against Officer Bonilla because Officer Bonilla complained of racial discrimination in the BPD.

52. As a result of this retaliation, Officer Bonilla has suffered and will continue to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Chief Sherma for the following relief:

a. Compensatory Damages;

b. Punitive Damages;

c. Attorneys' fees and costs of suit;

d. Such other and further relief that the Court deems equitable and just.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. §§ 1981 and 1983 RETALIATION – BUENA

53. Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

54. Buena retaliated against Officer Bonilla and/or caused and condoned a pattern of

retaliatory harassment against Officer Bonilla because Officer Bonilla attempted to enforce his rights by opposing and complaining about racial discrimination.

55. Buena retaliated against Officer Bonilla and/or caused and condoned a pattern of retaliatory harassment against Officer Bonilla because of his protected activity.

56. Acting under the color of law, Buena intentionally, knowingly, or with deliberate indifference to the rights of Officer Bonilla, violated his rights under 42 U.S.C. § 1981, which are made applicable to Buena by way of 42 U.S.C. §1983.

57. As a result of this retaliation, Officer Bonilla has suffered and will continue to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Buena for the following relief:

   a. Compensatory Damages;

   b. Punitive Damages;

   c. Attorneys' fees and costs of suit;

   d. Such other and further relief that the Court deems equitable and just.

### FIFTH CLAIM FOR RELIEF
### NJLAD – RACIAL HARASSMENT
### HOSTILE WORK ENVIRONMENT– BUENA

58. Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

59. Buena caused and allowed the work environment at the Buena Police Department to be racially charged.

60. Superior officers at the BPD who were responsible for maintaining a work environment free from discrimination abused their supervisory powers to create a racially hostile work environment.

61. High level officials at the BPD and in Buena were aware of the hostile working environment, but were willfully indifferent to it.

62. Buena failed to have in place effective policies and procedures for Officer Bonilla to utilize to complain about the harassment and retaliation he was facing in his work environment.

63. The actions and omissions of Buena were taken in violation of the New Jersey Law Against Discrimination, N.J.S.A., 10:5-1 *et seq*. and have caused Officer Bonilla to suffer economic, emotional and psychological damages in an amount to be determined by a jury.

64. As a result, Officer Bonilla has suffered and will continue to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Buena for the following relief:

    a. Compensatory Damages;

    b. Punitive Damages;

    c. Attorneys' fees and costs of suit;

    d. Such other and further relief that the Court deems equitable and just.

## SIXTH CLAIM FOR RELIEF
## NJLAD RETALIATION – BUENA

65. Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

66. Buena caused and allowed retaliation against Officer Bonilla, who engaged in "protected activity" and/or complained of discriminatory conduct. Officer Bonilla was subjected to retaliatory acts and retaliatory harassment because of the actions and inactions of Buena.

67. By the acts and practices described above, Buena unlawfully retaliated against Officer Bonilla because he engaged in protected activity under the New Jersey Law Against

14

Discrimination.

68. The actions of Buena were taken in violation of the New Jersey Law Against Discrimination, N.J.S.A., 10:5-1 *et seq.* and have caused Plaintiff to suffer economic, emotional and psychological damages in an amount to be determined by a jury.

69. As a result, Officer Bonilla has suffered and will continue to suffer emotional and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Buena for the following relief:

a. Compensatory Damages;

b. Punitive Damages;

c. Attorneys' fee and costs of suit;

d. Such other and further relief that the Court deems equitable and just.

## SEVENTH CLAIM FOR RELIEF
## CEPA

70. Officer Bonilla repeats and reasserts all of the allegations of each of the foregoing paragraphs, as if fully set forth herein.

71. Officer Bonilla complained to Buena (Chief Sherma) that the BPD was engaged in racial profiling that targeted Hispanics.

72. In retaliation for his complaints concerning and objections to racial profiling, Officer Bonilla was subjected to retaliatory harassment, that culminated in a hostile working environment.

73. Chief Sherma was aware of the retaliatory and hostile work environment that Officer Bonilla was being subjected to, but willfully refused to stop it. Instead, Chief Sherma directly contributed to the hostile work environment by harassing Officer Bonilla.

74. The actions of Buena were taken in violation of the Conscientious Employee Protection Act, N.J.S.A., 34:19-1 *et seq.* and have caused Officer Bonilla to suffer economic, emotional and psychological damages in an amount to be determined by a jury.

75. As a result, Officer Bonilla has suffered and will continue to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

WHEREFORE, Officer Bonilla demands judgment against Buena for the following relief:

a. Compensatory Damages;

b. Punitive Damages;

c. Attorney's fee and costs of suit;

d. Such other and further relief that the Court deems equitable and just.

## **JURY TRIAL DEMANDED**

Plaintiff requests a trial by jury on all issues so triable.

DATED: September 20, 2011

By: /s/ *Adam J. Kleinfeldt*
ADAM J. KLEINFELDT (AK-7129)
JOSEPH A. GINARTE

**GINARTE O'DWYER GONZALEZ
GALLARDO & WINOGRAD LLP**
400 Market Street
Newark, N.J. 07105
Counsel for the Plaintiff
T - 973.854.8400
F – 973.585.2600
akleinfeldt@ginartelaw.com